**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **LEXINGTON SURGICAL** ) | |
| **SPECIALISTS, P.S.C.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **NO. 5:21-CV-00007-MAS** |
| ) | |
| **KELI M. TURNER, M.D.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

<u>**MEMORANDUM OPINION & ORDER**</u>

The dispute between these parties' centers on Plaintiff Lexington Surgical Specialists, P.S.C.'s ("LSS") hiring of Defendant Keli M. Turner, M.D., a board-certified surgical oncologist, and her eventual departure from the practice. LSS argues Dr. Turner breached her contracts with LSS resulting in her owing substantial sums of money to LSS. Dr. Turner counters LSS misrepresented several facts to induce her into the contractual relationship dooming any chance of her success. The parties have filed competing motions for summary judgment for and against their respective claims. Having fully considered the record, the Court grants in part and denies in part these dispositive motions as detailed below.

1

## I.   <u>LEGAL STANDARD</u>

The dispute is properly before this Court based upon diversity jurisdiction. Thus, the Court will apply Kentucky substantive law and Federal Rule of Civil Procedure 56 to the motions before it.

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 629 (6th Cir. 2014). A genuine dispute over issues of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The key question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52; *see also Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 323). If that burden is met, the nonmoving party must then present sufficient evidence from which a jury could find for it. *Harrison*, 539 F.3d at 516 (citing *Anderson*, 477 U.S. at 252). In doing so, the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In general, at the summary judgment stage the Court views all facts and inferences drawn from the evidence "in the light most favorable to the nonmoving

2

party." *Black v. Pension Ben. Guar. Corp.*, 983 F.3d 858, 862 (6th Cir. 2020) (citing *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019)).

## II.   FACTUAL BACKGROUND

In the spring of 2017, Dr. Turner interviewed with LSS about a possible position as a general surgeon and surgical oncologist at Baptist Health Lexington ("Baptist"). The focus of this litigation turns on (1) the representations made by LSS to Dr. Turner during the employment negotiations and (2) the terms of the eventually executed contracts.

### A.   TURNER INTERVIEW

During Dr. Turner's interview with LSS, she spoke with several members of the organization, including managing partners for LSS, Dr. Walid Abou-Jaoude and Dr. Matt Shane, as well as the two existing surgical oncologists with LSS, Dr. Peter Tate and Dr. Nicholas Schaub.

One of the topics of conversations was whether she could be financially successful at LSS. For example, the parties discussed the number of surgical patients seen by LLS, including surgical oncology patients. Initially, when speaking with Dr. Abou-Jaoude and Dr. Shane, both represented to her that LSS had enough patients to support her practice and that she could become financially successful at LSS. [DE 25, Page ID# 190]. However, the parties did not discuss specific figures, compensation packages, or any contractual details. [DE 61-1, Page ID# 1329].

Dr. Turner asked Dr. Schaub if there was sufficient patient volume to support more than one surgical oncologist. "And Dr. Schaub told me there's not enough volume for two surgical oncologists." [DE 61-1, Page ID# 1331-32]. In fact, Dr. Tate

had warned his partners over the years about the lack of patient volume to support more than one surgical oncologist.  [DE 61-3, Page ID# 1981, 2107].

By Dr. Turner's own admission, her focus during the interview was about patient volume because she assumed patient volume drove profitability and her chances at financial success.  However, upon receipt of her contractual documents with LSS and during her practice, she realized she was wrong.

> A: [P]atient volume is irrelevant at this practice when it comes to the contract, because the way -- because volume does not translate into collected fees.  When you subtract your incremental expenses, it does not leave you with a salary that is viable. . . . The surgeon can't afford it the way the contract is structured.  That is the misrepresentation.
>
> Q: Okay.  So the patient analysis component isn't something that was important to you?
>
> A: It was important.  And at the time, that's what I understood to be important because I didn't know -- I didn't have a contract at the time. I didn't know that Nicholas Schaub left in debt when I signed the contract.  The contract of leaving in debt, that, to me, was like a nuclear option.  That was not going to happen.  I did not anticipate that.  I did not find this information out, piece this information out until later, as I was essentially leaving, that patient volume means nothing.  This is the misrepresentation.

[DE 61-1, Page ID# 1564-65].

The other focus during the interview was the future plans for Dr. Tate and Dr. Schaub.  During the interview, Dr. Turner was told that "the plan was for Dr. Tate to ramp down and whoever were to come in to ramp up to essentially take over Dr. Tate's practice."  [DE 61-1, Page ID# 1331-32].  The "ramp down" process was over the following two years and Dr. Turner was the presumptive replacement for Tate. [DE 61-1, Page ID# 1337].  Meanwhile, Dr. Schaub "was on his way out the door." [DE 61-1, Page ID# 1332].  When Dr. Turner spoke to Dr. Shane, he affirmed Dr. Tate

was winding down and that Dr. "Schaub is out of here.  You're going to be it."  [DE 61-1, Page ID# 1555].  Per Dr. Turner, "[t]he assumption and the conclusion that I gathered in talking to the people in the practice . . . was that I was going to be the sole surgical oncologist." [DE 61-1, Page ID# 1558-59].

**B.    RETENTION OF ANOTHER DOCTOR**

As early as 2009, LSS began recruiting Dr. Shaun McKenzie for a position as surgical oncologist with LSS.  [DE 60-3, Page ID# 1190].  At that time, Dr. McKenzie declined LSS's offer.  [DE 60-3, Page ID# 1190].  Then, at some point in 2017, LSS became "aware that Baptist Lexington was seeking a Medical Director of its Cancer Care Center, and that Dr. McKenzie might be interested in that position."  [DE 60-3, Page ID# 1191].  In July of 2017, a month after interviewing Dr. Turner but well before the execution of her contracts with LSS in August 2017, LSS interviewed Dr. McKenzie.  [DE 61-4, Page ID# 2087].

There is no dispute that LSS did not inform Dr. Turner during her interview or during the negotiation of her contracts with LSS about LSS's pursuit of Dr. McKenzie.  [DE 61-4, Page ID# 2088-89].

Dr. McKenzie eventually joined the practice in April 2018 as a part-time surgeon after Dr. Tate left the practice.  [DE 62, Page ID# 2351].

**C.    EMPLOYMENT & RECRUITMENT AGREEMENTS**

The negotiations between LSS and Dr. Turner resulted in the execution of two contracts, the Employment Agreement and Recruitment Agreement, in and around August 2017.

5

The Employment Agreement set forth that Dr. Turner was to be paid an annual salary of $300,000.00 "as a general surgeon and surgical oncologist" for LSS.[1] In many regards, the Employment Agreement is simple and straightforward. Yet, its inclusion and incorporation of the Recruitment Agreement becomes much more complicated. To satisfy Dr. Turner's salary, LSS obtained financial assistance from Baptist. The Employment Agreement provided:

> In the event that [LSS] pays any amount(s) to [Baptist] pursuant to the Recruitment Agreement as a result of (i) [Turner] ceasing to practice within the Corporation, (ii) [Turner] not maintaining a practice in [Baptist's] service area, or (iii) [Turner] violating or failing to comply with the terms of the Recruitment Agreement, [Turner] agrees to pay to [LSS] all amounts paid by [LSS] to [Baptist] pursuant to the Recruitment Agreement.

[DE 60, Page ID# 1105].

The Recruitment Agreement, signed by Turner, LSS, and Baptist, governed the financial support for Dr. Turner's Employment Agreement. Per the Recruitment Agreement, Dr. Turner was to be paid $300,000.00 each year or $25,000.00 each month for the first two years. At the end of each month, if Dr. Turner's collected fees less incremental expenses was less than the monthly guaranteed amount of $25,000.00, Baptist would loan LSS that difference. However, if Dr. Turner remained in the area for an additional two years beyond her employment with LSS, any debt would be forgiven.

---

[1] The Employment Agreement was executed between Dr. Turner and United Surgical Associates, a contract that was later assigned to LSS. [DE 60, Page ID# 1105].

6

However, returning to the Employment Agreement, the document made clear that any owed money from LSS to Baptist was the responsibility of Dr. Turner.

> It is [LSS's] express intent that [Turner] be solely responsible for any repayments to [Baptist] under the Recruitment Agreement. It is [LSS's] express intent that [Turner] be solely responsible for any repayments to [Baptist] under the Recruitment Agreement. In the event that [LSS] pays any amount to [Baptist] as described above, [Turner] shall indemnify and hold harmless [LSS] for the full amount of all such payments and the amount of all costs and expenses of recovering such amounts from [Turner] (including, but not limited to, reasonable attorney's fees).

[DE 60, Page ID# 1105-6].

After reviewing both contracts with her private attorney, Dr. Turner entered into the Employment Agreement and Recruitment Agreement with LSS. [DE 61-1, Page ID# 1388, 1395]. These agreements form the basis of LSS's breach of contract claims.

**D.** **TURNER'S DEPARTURE**

In October 2019, Dr. Turner accepted a position with Baptist Memorial Health Care ("Baptist Memorial") in Memphis Tennessee. [DE 60, Page ID# 1108]. Dr. Turner concedes her work with Baptist Memorial is outside Baptist's service area meaning she does not receive the forgiveness provision in the Recruitment Agreement. [DE 60, Page ID# 1108].

**E.** **LSS PAYMENTS TO BAPTIST**

During Dr. Turner's tenure and under the terms of the Recruitment Agreement, LSS accrued a debt of $371,738.29. [DE 60, Page ID# 1109]. Inclusive of interest, LSS paid Baptist $393,174.53 in satisfaction of the debt. [DE 60, Page ID# 1109]. Turner has not repaid this debt.

7

### III.   **ANALYSIS**

Based on all the facts outlined above, both parties have brought claims against the other.  LSS asserts claims for breach of contract based upon the Employment Agreement and Recruitment Agreement.  [DE 1].

Dr. Turner has filed a single claim of fraudulent misrepresentation that encompasses many different misrepresentations.   She also claims negligent misrepresentation.  The Court struggles, as do the parties, to clarify the various misrepresentations as presented by Dr. Turner.  Turner often blends various aspects of patient volume and financial success while mixing law from cases concerning both fraudulent misrepresentation by omission and fraudulent misrepresentation by commission, torts with very different elements.  [DE 61, Page ID# 1249-50 (citing *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (setting forth the elements of fraudulent misrepresentation by commission) as well as *Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003) (discussing an exception to fraudulent misrepresentation by omission)].  *See Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003) (detailing the different elements for fraud by commission as opposed to fraud by omission).  Dr. Turner does not, however, plead fraud by omission.  [DE 25].  Thus, the Court will analyze her claims only under the elements of her two remaining claims, fraudulent misrepresentation and negligent misrepresentation.

Turner's claims of fraudulent misrepresentation and negligent misrepresentation act, in part, as a defense against LSS's breach of contract claims. For fraudulent misrepresentation, Turner avers that LSS "took advantage of [her]

inexperience and proposed a formula-based compensation plan for [her] that [LSS] knew would be insufficient to generate enough revenue for Dr. Turner to meet her obligations" under the agreements.  [DE 25, Page ID# 190].  Turner also alleges that LSS hired "a second surgical oncologist to be in direct competition with her" after affirmatively assuring her she would be the sole surgical oncologist upon the departure of Drs. Tate and Schaub.  [DE 25, Page ID# 197].  For her negligent misrepresentation claim, Dr. Turner further states that two of LSS's managing partners "specifically told [Turner] that [LSS] had enough patients for her to become a financially successful surgeon and that [LSS] had a large volume of surgical oncology, but that was untrue."  [DE 25, Page ID# 190].[2]

LSS attempted to group these misrepresentations into "patient volume" and "recruitment of a second surgeon" but often veers back and forth between the two.  [*See* DE 60, Page ID# 1122-26].  The Court will attempt to address various nuances of Dr. Turner's alleged misrepresentation claims and narrow the dispute.

## F.   TURNER'S CLAIMS OF PATIENT VOLUME & FINANCIAL SUCCESS

Fraudulent misrepresentation "requires proof, by clear and convincing evidence, of the following six elements: (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the

---

[2] Dr. Turner also asserted a claim for negligent misrepresentation based upon allegedly false "incremental expense reports each month."  [DE 25, Page ID# 197].  In its Order addressing LSS's Motion to Dismiss, the Court dismissed this claim.  [DE 31, Page ID# 222 ("The Court rejects the tort theory as to expenses.")].  Although Dr. Turner re-raises these arguments in her motion for summary judgment [DE 61, Page ID# 1253-55], the Court will not re-tread this ground.

declarant induced the [complaining party] to act upon the misrepresentation, (5) that the [complaining party] relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the [complaining party]." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009).

The Court finds that Dr. Turner has presented sufficient evidence on the first four elements to survive summary judgment:  She states that two of LSS's managing partners, Dr. Abou-Jaoude and Dr. Shane, "specifically told [Turner] that [LSS] had enough patients for her to become a financially successful surgeon and that [LSS] had a large volume of surgical oncology, but that was untrue."  [DE 25, Page ID# 190]. For summary judgment purposes, this allegation satisfies the first three elements of fraudulent misrepresentation, as the Court finds it was a material representation, that it was false, that Dr. Abou-Jaude and Dr. Shane made the statement knowing it was false, and with the intention to induce Dr. Turner into the contract.  These facts are supported throughout her deposition testimony, as well as in the deposition testimony of others.  For example, Dr. Abou-Jaoude testified it was not for LSS "to determine [whether LSS had sufficient volume for it to employ multiple surgical oncologists].  That's determined by the hospital[,]"  [DE 61-2, at Page ID# 1935].  That Dr. Abou-Jaoude could assure Dr. Turner there was "a large volume of surgical oncology" but also be completely unable to provide an opinion as to whether he, as the managing partner, thought the practice could support more than one surgical oncologist, is suspicious and at a minimum would create a factual issue for the jury to consider.

10

Where Dr. Turner's fraudulent misrepresentation claim regarding patient volume fails, however, is on the fifth element. The tort requires Dr. Turner to establish reasonable reliance on the misrepresentation. *Associated Warehouse, Inc. v. Banterra Corp.*, No. 5:08-cv-52, 2010 WL 2745981, at *5 (6th Cir. July 9, 2010) ("AWI's last three counts in its Second Amended Complaint allege fraud by omission, negligent misrepresentation, and promissory estoppel. These claims, although requiring proof of distinct elements, each require AWI establish that it reasonably relied upon the [alleged misrepresentation].") (citing Kentucky authorities in support). "Where the plaintiff does not believe the statements or where he has knowledge to the contrary, recovery is denied." *Wilson v. Henry*, 340 S.W.2d 449, 451 (Ky. 1960).

Reasonable reliance defeats Dr. Turner's misrepresentation claims concerning patient volume. Dr. Turner knew that Dr. Abou-Jaoude and Dr. Shane's representations were specious before she ever entered a contractual relationship with LSS a couple months later. As she testified, both Dr. Tate and Dr. Schaub told her there was not enough patient volume to support more than one surgical oncologist during the interview process clearly contradicting LSS's managing partners. [DE 61-1, Page ID# 1331-32]. She knew Dr. Tate was going to be at the practice the next two years. Dr. Turner was given every indication that patient volume was a real concern with LSS. Thus, to the extent that Dr. Turner attempts to claim this misrepresentation is actionable, the Court holds otherwise. *See Flegles, Inc.*, 289 S.W.3d at 549 (discussing that no reliance can exist "where the opinion either

11

incorporates falsified past or present facts or is so contrary to the true current state of affairs that the purpose prediction is an obvious sham."). Dr. Turner could not rely upon the representations of patient volume from Dr. Abou-Jaoude and Dr. Shane while being told the opposite by Dr. Schaub during the same interview.

Once Dr. Turner had the proposed Employment and Recruitment Agreements in hand, it was even less reasonable for her to believe that patient volume would impact her financial success as Dr. Abou-Jaoude and Dr. Shane represented it would. Dr. Turner alleges that LSS "took advantage of [her] inexperience and proposed a formula-based compensation plan for [her] that [LSS] knew would be insufficient to generate enough revenue for Dr. Turner to meet her obligations" under the agreements. [DE 25, Page ID# 190]. Or, as Dr. Turner put it, "[t]he surgeon can't afford it the way the contract is structured. That is the misrepresentation." [DE 61-1, Page ID# 1564-65]. "[I]t was the idea that [LSS] discussed patient volume" that Dr. Turner felt was misleading when the contracts were not based upon patient volume. [DE 61-1, Page ID# 1566]. However, Dr. Turner cannot claim a bait and switch on compensation because when she received the Employment and Recruitment Agreements after the discussion of patient volume, the contracts were explicit in their compensation structure, none of which included patient volume. She reviewed those documents with her counsel. [DE 61-1, Page ID# 1388, 1393, 1395]. Dr. Turner even asked for changes to the contracts, albeit LSS rejected those requests. [DE 61-1, Page ID# 1393]. At that point, Dr. Turner "had knowledge to the contrary" to suggest that her financial success or failure was not driven by patient

volume. *Wilson v. Henry*, 340 S.W.2d at 451. To the extent Dr. Turner claims an intentional or negligent misrepresentation on the broad representation that there was enough patient volume at LSS generally and/or that such patient volume would allow her financial success, Dr. Turner knew or surely should have known better.

These representations over patient volume also serve as the basis of Dr. Turner's negligent misrepresentation claim. [DE 25, Page ID# 197 ("Plaintiff's managing partners Dr. Walid Abou-Jaoude and Dr. Shane falsely told Defendant that the Practice had sufficient patient volume for Dr. Turner to succeed as a surgical oncologist in the Practice during her interview.")]. As Judge Wier analyzed in his Order on the Motion to Dismiss in this matter, Kentucky has adopted the standards for negligent representation contained in the Restatement (Second) of Torts §§ 552, which includes a requirement that the claimant justifiably relied on the information provided. [DE 31 at Page ID# 222-25]. As Judge Wier also pointed out, there is doubt whether a negligent representation claim applies in an employer-employee context in Kentucky. [DE 31 at Page ID# 224]; *Kannapel v. Int'l Bus. Machines Corp.*, 2021 WL 4164689, at *8 (W.D. Ky. 2021). Nonetheless, the Court need not determine whether this is, in fact, a legally cognizable claim in Kentucky. Even if the Court were to permit the claim, Dr. Turner cannot succeed because, like with fraudulent misrepresentation claim, she cannot meet the justifiable reliance prong of negligent misrepresentation.

In summary, Dr. Turner's allegations against LSS for fraudulent and negligent misrepresentation based upon general representations of patient volume and/or her

financial success fail for lack of reasonable reliance. Dr. Turner has established that LSS made these false statements, but LSS has likewise countered that Dr. Turner had information that contradicted those representation by the time she was induced to enter a contractual relationship with LSS. Dr. Turner's reliance was misplaced. Thus, Dr. Turner's claim for fraudulent misrepresentation and negligent misrepresentation on these grounds is dismissed.

## G.   HIRING OF SECOND SURGICAL ONCOLOGIST

The remaining fraudulent misrepresentation claim raised by Dr. Turner is that LSS instructed her that she was to be the only surgical oncologist at the practice. LSS, however, knew the statement was false because it was in the process of hiring a second surgical oncologist, Dr. McKenzie.

As this Court previously identified, a fraudulent misrepresentation claim "requires proof, by clear and convincing evidence, of the following six elements: (1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the [complaining party] to act upon the misrepresentation, (5) that the [complaining party] relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the [complaining party]." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). And as already referenced above, Dr. Turner's reliance must have been reasonable or "justifiable." *Id.*

In the Court's review, the parties' competing motions for summary judgment focus almost exclusively on the first element. The Court will do the same.

14

Dr. Turner testified that she was told at some point during her interview process that she was to be the LSS's sole surgical oncologist following Dr. Tate and Dr. Shaub wrapping up their respective practices. [DE 61-1, Page ID# 1555]. Per Dr. Turner, "[t]he assumption and the conclusion that I gathered in talking to the people in the practice . . . was that I was going to be the sole surgical oncologist." [DE 61-1, Page ID# 1558-59].

Initially, LSS argues that Dr. Turner never asserted this claim. The Court disagrees for several reasons. First, Dr. Turner cited the representation to her by LSS that it intended to hire a second surgeon in her Counterclaim. [DE 25, Page ID# 191, 197]. As if that is not enough, second, the Court analyzed this very representation in its Order addressing LSS's Motion to Dismiss. [DE 31, Page ID# 219]. Third, the representation was discussed at length at Dr. Turner's deposition. [DE 61-1, Page ID# 1711 (counting a use of the word "sole" 17 times in the deposition of Dr. Turner alone)]. Even if Dr. Turner did not plead the misrepresentation with particularity in her Counterclaim, LSS went to great lengths during Dr. Turner's deposition pinning down who made the representation to Dr. Turner, when during the interview process, and how she supposedly relied on that representation. *United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 F. App'x 404, 406 (6th Cir. 2018) ("Rule 9(b) requires a plaintiff to state with particularity the circumstances constituting fraud—*i.e.*, the who, what, when, where, and how of the alleged fraud."). The fact that LSS chose to pursue the specifics of Rule 9(b) **after** discovery as opposed to at the pleading stage was its choice. At this point, LSS is clearly on notice of the specifics

15

and particularity of the claim at issue.  *See Whalen v. Stryker Corp.*, 783 F. Supp. 2d 977, 982 (E.D. Ky. 2011) ("Rule 9(b)'s particularity requirement must be 'read in harmony' with Rule 8.").

Next, LSS also contests this implication as improper "inference stacking."  [DE 62, Page ID# 2356].  LSS provides the following quote in support:

> As the fact-finder, the trial court was entitled to draw reasonable inferences from the evidence.  However, the [moving party] cannot sustain its burden of proof by the compounding of inferences upon inferences.  A conclusion based on multiple levels of inference does not rise above the level of mere speculation.

*K.H. v. Cabinet for Health & Family Services*, 358 S.W.3d 29, 32 (Ky. App. 2011).  The Court disagrees with this argument.  The decision in *K.H.* is a procedural ruling related to an evidentiary hearing in state court.  It has no application in federal court either procedurally in applying the Federal Rules of Civil Procedure or substantively as K.H. has nothing to do with misrepresentation claims.  Under FED. R. CIV. P. 56, the burden rests with LSS who is asking the Court for summary judgment.  The Court must view all facts and inferences drawn from the evidence "in the light most favorable to the nonmoving party," not against the nonmoving party.  *Black v. Pension Ben. Guar. Corp.*, 983 F.3d 858, 862 (6th Cir. 2020) (citing *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019)).  LSS cannot somehow shift the burden to Dr. Turner by citing a state court case that has no procedural or substantive application to this case.

To the extent LSS is using the case as a vehicle to complain that Dr. Turner has pieced together the representation through inference, the Court rejects that argument given the current facts and circumstances.  The Court recognizes that

Turner's fraudulent misrepresentation claim is based, in part, on inference. She said as much. "The assumption and the conclusion that I gathered in talking to the people in the practice ... was that I was going to be the sole surgical oncologist." [DE 61-1, Page ID# 1558-59]. But it was more than this; it was also based on affirmative statements from several doctors at LSS according to her deposition testimony. When she spoke to Dr. Shane, he told her that Dr. "Schaub is out of here. You're going to be it." [DE 61-1, Page ID# 1555]. When asked who told her she was going to be the sole surgical oncologist, Dr. Turner answered, "[e]verybody in the practice I interviewed with: Dr. Tate, Dr. AJ, Dr. Shane." [DE 61-1 at Page ID# 1551]. Viewing all facts in the light most favorable to Dr. Turner, which the Court must do at this procedural stage, then LSS certainly misled Turner that she would be the sole surgical oncologist moving forward following the departure of Dr. Tate and Dr. Schaub. In its Sur-Reply, LSS heavily contests Dr. Turner's testimony arguing her later testimony undercuts this prior testimony. [DE 67, Page ID# 2462]. LSS points out that, at best, Dr. Turner may have practically been the only surgical oncologist in practice but only after Dr. Tate had ramped down his practice over the coming year. [DE 69, Page ID# 2477]. But LSS never represented that she would always be the sole surgical oncologist. LSS refutes that it made an affirmative representation to Dr. Turner that she would be the sole surgical oncologist.

In the end, the Court is tasked with determining if there is a material dispute of fact. In this case, both parties have presented compelling arguments that the representation did or did not occur under the first element. Both dissect and

17

reconstruct Dr. Turner's lengthy deposition. The Court is far from convinced from either narrative or that these narratives are clear—essentially, this a murky factual issue for the jury to decide.

LSS argues the hiring of Dr. Turner pre-dated the pursuit of Dr. McKenzie, presumably attacking the second and third elements. [DE 62, Page ID# 2349]. Thus, by LSS's logic, LSS was not making a false statement when representing to Dr. Turner that she was going to be the sole surgical oncologist because Dr. McKenzie was not in the picture. The record, however, simply does not support this version of the facts. Per LSS, it had previously recruited Dr. McKenzie as early as 2009 for a position that he declined. [DE 60-3, Page ID# 1190]. Then, at some point in 2017, LSS became "aware that Baptist Lexington was seeking a Medical Director of its Cancer Care Center, and that Dr. McKenzie might be interested in that position." [DE 60-3, Page ID# 1191]. Dr. Turner was interviewed for the position of surgical oncologist in June 2017 in which the representations at issue were made. Then, the following month, LSS interviewed Dr. McKenzie. [DE 62, Page ID# 2349]. Dr. Turner then negotiated and executed the Employment and Recruitment Agreement with LSS in August of 2017. [DE 60-3, Page ID# 1191]. At no point, either during the interview or in the weeks between the interview and execution of the contracts, does LSS ever correct the representation to Dr. Turner.

Finally, Dr. Turner also testified that she "would have never signed on if [she] was not going to be the only one [surgical oncologist]." [DE 61-1 at Page ID# 1551]. She testified majority of cancer surgeries with Baptist Hospital were inexplicably

18

referred to Dr. McKenzie after his arrival.  [DE 61-1 at Page ID# 1295 ("So when a patient would enter the hospital and someone needed a cancer surgeon, before Dr. McKenzie came, I was called.  Once Dr. McKenzie came, I was never called, essentially.").  This statement evinces her reliance on the representations of LSS and damages, and again, creates a genuine issue of material fact sufficient for this claim to proceed to trial.  Accordingly, the Court will deny summary judgment for both parties on this remaining aspect of Dr. Turner's fraudulent misrepresentation claim.[34]

## H.  LSS'S BREACH OF CONTRACT CLAIM

The contracts between the parties guaranteed a Dr. Turner salary of $300,000 for two years via a loan from LSS by way of Baptist.  Against this amount, LSS applied Dr. Turner's "Collected Fees" less "Incremental Expenses" for that two-year period plus a ninety-day runout period.  If the result of this latter sum did not exceed the salary amount, Dr. Turner owed the difference.  "It is the party's express intent that [Turner] be solely responsible for any repayments to [Baptist] under the Recruitment Agreement."  In total, LSS paid Baptist $371,738.29 under the

---

[3] The Court recognizes that while the Dr. Turner's legal claims concerning patient volume/financial success are dismissed, the facts about patient volume may become germane to the hiring of a second surgical oncologist.  The Court leaves the evidentiary inclusion or exclusion of facts surrounding patient volume in application to the hiring of Dr. McKenzie to the parties in their pretrial motion practice.

[4] Dr. Turner argues for the first time in her motion for summary judgment that LSS breached its implied duty of good faith and fair dealing.  [DE 61 at Page ID# 1255-56].  Dr. Turner did not raise this as a Counterclaim, nor did she plead it as an affirmative defense in her Answer. [DE 25 and 52].  Nonetheless, in her Reply, Dr. Turner clarifies that she raised the issue as a defense to LSS's contract claims.  [DE 65 at Page ID# 2428].  Thus, though the parties have spilled much ink over this issue, there is no motion or claim before the Court on which the Court can make a ruling.

Recruitment Agreement for the first two years.  [DE 60, Page ID# 1117].  However, when Dr. Turner's Collected Fees for the runout period are included, the amount is reduced to $348,485.74.  [DE 60, Page ID# 1117].  LSS claim for breach of contract is based upon Dr. Turner's failure to pay that amount under the contracts.

Dr. Turner does not contest that she breached the Employment and Recruitment Agreements.  [DE 63].  Rather, she attacks LSS's motion for summary judgment on two fronts.  First, Dr. Turner claims the contracts were the byproduct of fraud as detailed in her Counterclaim.  The Court has addressed those arguments above; Turner's claim of fraud will be settled by a jury.  Second, Dr. Turner contests LSS's calculation of the damages as to both the Collected Fees and the Incremental Expenses.

Given that Dr. Turner's fraud claim survives not only as her Counterclaim but also as her affirmative defense [DE 52, Page ID# 321], the Court will decline to analyze the merits of LSS's motion for summary judgment on its contract claims.  If Turner's affirmative defense of fraud is successful, then Kentucky law mandates that the contract relationship between Turner and LSS is voidable.  *Pence v. VNB New York, LLC*, No. 2018-CA-1259, 2019 WL 4389158 (Ky. App. Sept. 13, 2019); *Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 489 (6th Cir. 2001) (applying Kentucky law); *American Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004)("fraud in a contract's formation can defeat its enforceability") (discussion of basic contract and tort law principles in a case in which California substantive law governed).  The Court cannot resolve the contractual claims until the fraud claim is

resolved as this claim also serves as Dr. Turner's defense to the breach of contract claim against her. *Koch Carbon, LLC, v. DS Energy, Inc.*, No. 05-cv-33-GFVT, 2007 WL 9747286, at *4 (E.D. Ky. Feb. 2, 2007) ("As fraud was the only defense asserted by DS Energy for its admitted failure to meet the Contract's terms, summary judgment must be granted in favor of Koch Carbon on the issue of breach of contract") (applying Kentucky law). Stated another way, because the Court finds there are material disputes of fact on whether there was fraud in the formation of the contractual relationship between Dr. Turner and LSS, the Court will refrain from analyzing that contractual relationship.

## IV.   CONCLUSION

For the foregoing reasons**, IT IS ORDERED** as follows:

1.     LSS's Motion for Summary Judgment [DE 60] is **GRANTED IN PART, and DENIED IN PART**. LSS's requests for summary judgment relevant to its contractual claims will remain. Dr. Turner's Counterclaim for fraudulent misrepresentation and negligent misrepresentation concerning patient volume and general financial success are **DISMISSED WITH PREJUDICE**. Dr. Turner's claim for fraudulent misrepresentation concerning the hiring of a second surgical oncologist will remain.

2.     Dr. Turner's Motion for Summary Judgment [DE 61] is **GRANTED IN PART, and DENIED IN PART** consistent with the findings set forth for LSS's Motion for Summary Judgment.

3.     LSS's Motion for Leave to File a Sur-Reply [DE 67] is **GRANTED**. The Clerk is directed to file the Sur-Reply marked as Exhibit 2 for DE 67 in the record.

Entered this 2nd day of November, 2023.

MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY