**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | | |
|---|---|---|
| **LEXINGTON SURGICAL** | ) | |
| **SPECIALISTS, P.S.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **NO. 5:21-CV-00007-MAS** |
| **KELI M. TURNER, M.D.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

The Court previously addressed cross-motions for summary judgment nearly resolving all the disputes between the parties. [DE 72]. Plaintiff Lexington Surgical Specialists, P.S.C.'s ("LSS"), at the Court's direction [DE 79], has filed a second motion for summary judgment arguing that Defendant Keli M. Turner, M.D. does not have proof of damages in support of her remaining fraud claim. [DE 80]. Moreover, any attempt by Dr. Turner to use fraud as affirmative defense is legally foreclosed. [DE 80]. Dr. Turner countered with an affidavit detailing her alleged damages. [DE 82]. Having reviewed the arguments, the Court finds that summary judgment in favor of LSS is necessary, both as to Dr. Turner's remaining fraud claim and LSS's breach of contract claims.

1

## I.   FACTUAL & PROCEDURAL BACKGROUND

**A.   RELEVANT FACTUAL BACKGROUND**

As referenced above, the Court issued a previous Memorandum Opinion and Order addressing prior dispositive motion practice. [DE 72]. There, the Court summarized and detailed the facts that led to this litigation. [DE 72, Page ID# 2484-88]. The Court will summarize, however, the facts relevant to the remaining issues.

In the spring of 2017, Dr. Turner interviewed with LSS about a possible position as a general surgeon and surgical oncologist at Baptist Health Lexington ("Baptist"). As part of that interview process, Dr. Turner has alleged that LSS represented to her that she would be the sole surgical oncologist with LSS following the departure of the two prior surgical oncologists, Dr. Peter Tate and Dr. Nicholas Schaub. [DE 61-1, Page ID# 1331-32, 1337, 1555, 1558-59]. Dr. Turner alleges that this was important representation as she was unsure if the practice had enough volume to justify two surgical oncologists.

In July of 2017, a month after interviewing Dr. Turner but well before the execution of her contracts with LSS in August 2017, LSS interviewed Dr. Shaun McKenzie, a surgical oncologist. [DE 61-4, Page ID# 2087]. Dr. McKenzie eventually joined the practice in April 2018 as a part-time surgeon after Dr. Tate left the practice. [DE 62, Page ID# 2351].

**B.   CONTRACT FORMATION**

The contracts governing the relationship between Dr. Turner and LSS are an Employment Agreement and a Recruitment Agreement.

2

The Employment Agreement set forth that Dr. Turner was to be paid an annual salary of $300,000.00 "as a general surgeon and surgical oncologist" for LSS for a period of two years.[1]  In many regards, the Employment Agreement is simple and straightforward.

The Recruitment Agreement, signed by Turner, LSS, and Baptist, governed the financial support for Dr. Turner's Employment Agreement.  Per the Recruitment Agreement, Dr. Turner was to be paid $300,000.00 each year or $25,000.00 each month for the first two years.  At the end of each month, if Dr. Turner's collected fees ("Collected Fees") less incremental expenses ("Incremental Expenses") was less than the monthly guaranteed amount of $25,000.00, Baptist would loan LSS that difference.  However, if Dr. Turner remained in the area for an additional two years beyond her employment with LSS, any debt would be forgiven.

However, returning to the Employment Agreement, the document made clear that any owed money from LSS to Baptist under the Recruitment Agreement was the sole responsibility of Dr. Turner.

> It is [LSS's] express intent that [Dr. Turner] be solely responsible for any repayments to [Baptist] under the Recruitment Agreement.  It is [LSS's] express intent that [Dr. Turner] be solely responsible for any repayments to [Baptist] under the Recruitment Agreement.  In the event that [LSS] pays any amount to [Baptist] as described above, [Dr. Turner] shall indemnify and hold harmless [LSS] for the full amount of all such payments and the amount of all costs and expenses of recovering such amounts from [Dr. Turner] (including, but not limited to, reasonable attorney's fees).

---

[1] The Employment Agreement was executed between Dr. Turner and United Surgical Associates, a contract that was later assigned to LSS.  [DE 60, Page ID# 1105].

[DE 60, Page ID# 1105-6].

After reviewing both contracts with her attorney, Dr. Turner entered into the Employment Agreement and Recruitment Agreement with LSS in August of 2017. [DE 61-1, Page ID# 1388, 1395].

When Dr. Turner left LSS in the fall of 2019, LSS argued that it had to pay Baptist a substantial sum under the terms of the Recruitment Agreement and now seeks indemnification from Dr. Turner under the terms of the Recruitment and Employment Agreements.

## C.   LSS's FIRST MOTION FOR SUMMARY JUDGEMENT

In response to LSS's claims for breach of contract, Dr. Turner asserted a counterclaim alleging, *inter alia*, that LSS hired "a second surgical oncologist to be in direct competition with her" after affirmatively assuring her she would be the sole surgical oncologist upon the departure of Drs. Tate and Schaub. [DE 25, Page ID# 197]. She also asserted the affirmative defense to LSS's breach of contract claim that LSS "obtained [Dr. Turner's] consent to the contract of transaction through fraud, deceit, or misrepresentation by [LSS] and that as a result the contract is invalid." [DE 25, Page ID# 189].

In LSS's first motion for summary judgment [DE 60], LSS attacked this fraud claim in two ways. The first attack was that LSS never made the representation. Upon reviewing the various evidence presented, the Court concluded there was a material dispute of fact on the issue as there was evidence to support both narratives. [DE 72, Page ID# 2495-2500]. The second attack argued that, to the extent it made the representation to Dr. Turner, it did not do so with knowledge it was false or made

4

recklessly.  Again, the record was far from clear precluding summary judgment.  [DE 72, Page ID# 2499].

LSS then filed a motion for reconsideration arguing the Court should have considered that Dr. Turner does not have proof of damages to support her claim and/or affirmative defense of fraud.  [DE 75, 78].  The Court rejected the motion as LSS never asserted that argument in its first motion for summary judgment but permitted LSS to file a second motion for summary judgment to brief the argument and permit Dr. Turner an opportunity to present evidence of her damages.  [DE 79].

**D.**   **LSS'S SECOND MOTION FOR SUMMARY JUDGMENT**

LSS's current motion seeks to correct the omission from the first.  Namely, LSS contends Turner is both legally and factually precluded from asserting damages in this case.  Legally, LSS suggests a party asserting fraud may not seek the remedy of rescission when Dr. Turner affirmed the contract upon learning of the alleged fraud.  Factually, LSS highlights that Dr. Turner has not provided any specific and articulable proof of monetary damages related to the alleged fraud.

The Court will address each of these arguments in turn.

## II.   ANALYSIS

**A.**   **LEGAL STANDARD**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 629 (6th Cir. 2014).  A genuine dispute over issues of material fact exists when "there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The key question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52; *see also Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 323). If that burden is met, the nonmoving party must then present sufficient evidence from which a jury could find for it. *Harrison*, 539 F.3d at 516 (citing *Anderson*, 477 U.S. at 252). In doing so, the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In general, at the summary judgment stage, the Court views all facts and inferences drawn from the evidence "in the light most favorable to the nonmoving party." *Black v. Pension Ben. Guar. Corp.*, 983 F.3d 858, 862 (6th Cir. 2020) (citing *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019)).

B.   <u>TURNER'S CLAIM OF RESCISSION[2]</u>

"'Where an individual is induced to enter into the contract in reliance upon false representations, the person may maintain an action for a rescission of the contract, or may affirm the contract and maintain an action for damages suffered on account of the fraud and deceit.' But it cannot do both." *New London Tobacco Market, Inc. v. Kentucky Fuel Corp.*, 44 F.4th 393, 412-13 (6th Cir. 2022) (applying Kentucky law; internal citations omitted).  Between her counterclaim and affirmative defense, Turner is legally postured to pursue both, something permitted at the pleading stage. *Id.* at 413 (citing *LV Ventures, LLC v. Schott*, No. 2011-CA-473, 2012 WL 5039235, at *4 (Ky. App. Oct. 19, 2012)).

But rescission has its limitations.

> While it may be conceded that the rule is well established that where a party has been induced to enter into a contract by fraudulent representations, he may, upon discovering the fraud, rescind the contract, it is yet by the great weight of authority held that if the party defrauded continues to receive benefits under the contract, after he has become aware of the fraud, or if he conducts himself with respect to it as though it were a subsisting and binding engagement, he will be deemed to have affirmed the contract and waived his right to rescission. **In other words, one who has been misled must act promptly, upon learning the truth or discovering the falsity of the statements relied on, in disaffirming the contract, so as to give the other party opportunity of rescinding it and restoring them to their original position.  "The party deceived is not allowed to go on deriving all possible benefit from the transaction, and then**

---

[2] The parties, throughout their briefs, use the term rescission.  Per Black's Law Dictionary, the term means "[a] party's unilateral unmaking of a contract for a legal sufficient reason, such as the other party's material breach, or a judgment rescinding a contract." *Rescission*, BLACK'S LAW DICTIONARY (8th ed. 1999).  Other authorities sometimes use the spelling recision.  Black's Law Dictionary simply directs that spelling to the definition for rescission. *Recision*, BLACK'S LAW DICTIONARY (8th ed. 1999).  By all accounts, the two spellings are interchangeable.

7

> **claim to be relieved from his own obligation by seeking its rescission."**

*Sparks v. Baker*, 114 S.W.2d 1145, 1149 (Ky. 1938) (emphasis added; internal citations omitted).

In its motion, LSS argues Dr. Turner is not permitted to seek the remedy of rescission given that she performed under the contracts well after Dr. McKenzie's arrival. Dr. Turner does not contest this fact, though she argued "it was reasonable for her to continue with the performance of the contract as she was only beginning her profession as a surgical oncologist when she found out her employer had deceived her." [DE 82, Page ID# 2607 (internal citations omitted)]. Thus, by her own account, Dr. Turner concedes that she continued performance after the alleged fraud. Under Kentucky law she is therefore not entitled to seek the remedy of rescission.

Rather, Dr. Turner insists that this exception does not preclude her remedy of monetary damages. In support, she cites several Kentucky cases. "We are of the opinion that where a fraudulent representation is discovered after a contract is executed, affirmance or continued performance waives only the defrauded party's right to rescind the contract—not the right to sue for damages based upon fraud. We emphasize that this rule applies only if the knowledge of fraud was obtained after the contract was executed." *Hopkins v. Performance Tire & Auto Serv. Center*, 866 S.W.2d 438, 440–41 (Ky. App. 1993). *See also Warren Paving, Inc. v. Heartland Materials, Inc.*, No. 5:14-cv-149-TBR, 2015 WL 269204, at *5 (W.D. Ky. Jan. 21, 2015) (applying Kentucky law and holding the same). LSS does not disagree with this point.

Accordingly, as there is no material dispute of fact that Dr. Turner affirmed the contracts with LSS after she learned of the hiring of Dr. McKenzie, the Court grants summary judgment to LSS on Dr. Turner's claim of rescission.

## C.   DR. TURNER'S CLAIM OF DAMAGES

With Dr. Turner surrendering rescission, she is left with the possibility of monetary damages.  Since the start of the litigation, both sides agree Dr. Turner has always made a claim for monetary damages, from her Counterclaim identifying monetary damages [DE 25, Page ID# 196-97] to her initial disclosures citing "lost opportunities because of [LSS's] deception" [DE 58-16, Page ID# 992] to her discovery responses [DE 58-15, Page ID# 989] to her deposition [DE 58-1, Page ID# 699-700].  At the summary judgment stage, however, Dr. Turner must provide specific proof of those claimed damages.

Dr. Turner's theory of damages for her fraud claim seems straightforward.  Per Dr. Turner, LSS committed fraud when it hired Dr. McKenzie after telling her she would be the "sole" surgical oncologist.  Thus, her damage is the difference between the money Dr. Turner would have earned if she was the sole surgical oncologist and the money Dr. Turner did earn with Dr. McKenzie present.  Of course, while simple in theory, the analysis would surely require complex forensic accounting.  For example, Dr. Turner would need to separate clients Dr. McKenzie brought with him or were attracted directly to him as opposed to those who just came to Baptist with just a general need for a surgical oncologist.  Dr. Turner would also need to separate out surgeries that Dr. McKenzie performed that she could not (*i.e.*, laparoscopic esophagectomies, laparoscopic liver surgeries, laparoscopic pancreatectomies [DE 61-

9

1, Page ID# 1619-20]).  And the forensic examination would also require a review of Dr. McKenzie's call fee revenue to determine whether Dr. Turner would have received those call fees, in whole or in part.  In short, while Dr. Turner has advanced a compelling, valid theory, the details of that theory could be complicated.

Unfortunately, Dr. Turner's claim never made it past the theory stage.  In Dr. Turner's response to LSS, Dr. Turner does not provide any of the financial detail and specificity discussed above.  Rather, Dr. Turner provides a "2021 Pinnacle Health Group's Compensation Survey of 155 surveyed doctors and 166 healthcare organizations which shows the mean compensation of surgical oncologists was $490,127."  [DE 82, Page ID# 2608].  Although the survey demonstrates that Dr. Turner was underpaid by LSS in comparison with the mean compensation of surgical oncologist, the survey in no way relates the damages Dr. Turner allegedly suffered by LSS's decision to hire Dr. McKenzie.  Other than that survey, Dr. Turner provides no additional proof of damages.  Again, the Court requires more than a theory articulated in broad categories of damages at this stage.

> [Dr. Turner] must submit enough evidence that the jury could reasonably find for it at trial. *See Anderson* [*v. Liberty Lobby, Inc.*], 477 U.S. [242] at 252 [(1986)].  Additionally, since the allegation at issue here is fraud, the evidence must be such that, if believed, it would clearly and convincingly establish fraud. *See Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1446 (6th Cir. 1993); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  The only admissible evidence that [Dr. Turner] has presented in response to [LSS's] arguments is a single interrogatory response that merely lists categories of damages and amounts.  As no other evidence supports those assertions, [Dr. Turner's] arguments are supported by nothing more than a mere scintilla of evidence, which is certainly not enough for any reasonable jury to find for [DR. Turner] by clear and convincing evidence.

10

*Am. Pride Petroleum, Inc. v. Marathon Petroleum Co., LLC*, No. 07-250-ART, 2009 WL 1162423, at *13-14 (E.D. Ky. Apr. 29, 2009).

LSS has demonstrated that there is no genuine issue of material fact on whether Dr. Turner has suffered damages from the alleged fraud. Without more, Dr. Turner's claims cannot survive summary judgment. Accordingly, LSS is entitled to summary judgment on Dr. Turner's remaining fraud claim extinguishing all her counterclaims.

## D.   LSS'S BREACH OF CONTRACT CLAIM

In its prior Summary Judgment Opinion, the Court declined to analyze LSS's breach of contract claim despite full briefing on the claim by the parties. "The Court cannot resolve the contractual claims until the fraud claim is resolved as this claim also serves as Dr. Turner's defense to the breach of contract claim against her." [DE 72, Page ID# 2501-02]. Having resolved the defense and counterclaim of fraud asserted by Dr. Turner, the Court must now revisit LSS's breach of contract claim.

The Sixth Circuit has "held that a district court may enter summary judgment *sua sponte* in certain limited circumstances, 'so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.'" *Salehpour v. University of Tennessee*, 159 F.3d 199, 204 (6th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)). Specifically, the Sixth Circuit has held that FED. R. CIV. P. 56(c) mandates that the losing party must "be afforded notice and reasonable opportunity to respond to all the issues to be considered by the court." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir. 1995).

Here, following the conclusion of discovery, LSS previously moved for summary judgment on its breach of contract claims [DE 60] and Dr. Turner fully responded [DE 63]. Both parties were permitted full opportunity to present any and all legal arguments and necessary facts to the Court. The Court now exercises its discretion to revisit the motion considering Dr. Turner's fraud claims are now dismissed. *See Burden v. Check Into Cash of Kentucky, LLC*, 267 F.3d 483, 489 (6th Cir. 2001) (applying Kentucky law).

### 1. <u>Contractual Claims</u>

In its Complaint, LSS asserts breaches of both the Employment Agreement and Recruitment Agreement when Dr. Turner failed to compensate LSS for the money it paid to Baptist. Dr. Turner does not contest she breached these agreements. [DE 63]. Rather, Dr. Turner attacked LSS's motion for summary judgment on two fronts citing her counterclaims for fraud and challenging LSS's damages calculations.

For the fraud defense, the Court has addressed those arguments above and in its prior summary judgment Opinion. Thus, with no arguments from Dr. Turner presenting any material dispute of fact as to her alleged breach of the Employment Agreement and Recruitment Agreement, the Court shall grant summary judgment to LSS on its breach of contract claim.

For the contested damages amount, the Court must conduct a much more detailed analysis. As already stated, the contracts between the parties guaranteed Dr. Turner salary of $300,000 for two years via a loan from LSS by way of Baptist. Against this amount, LSS applied Dr. Turner's Collected Fees less Incremental Expenses for that two-year period plus a ninety-day runout period ("Runout Period").

12

If the result of this equation did not exceed the salary amount, LSS owed Baptist the difference.  And, via her Employment and Recruitment Agreements, Dr. Turner owed that amount to LSS.  Dr. Turner challenges the LSS's calculations for each part of this equation as to Collected Fees, Incremental Expenses, and the ninety-day runout period.

a.   <em>Collected Fees</em>

For the Collected Fees, Dr. Turner says LSS incorrectly failed to include call fees as part of the calculation.  Before analyzing this argument, the Court must define Collected Fees in the Recruitment Agreement and delve into the logistics of call fees.

The Recruitment Agreement defines Collected Fees as follows:

> "Collected Fees" is defined as all professional cash receipts, from whatever source, derived by or on behalf of Physician (or by persons otherwise billing under Physician's name or provider number) and actually received, **directly or indirectly**, by the Practice or by Physician, less cash refund.  Collected Fees **shall include (but not limited to) professional revenues received on account of services rendered by Physician, Physician's professional practice, including all patient care revenues, ancillary revenues payable to Physician, the Practice or an assignee thereof**, such as revenues from diagnostic tests and injections and other compensation payments generated by or allocable to Physician because of Physician's rendering of professional services or status as a licensed physician. Collected Fees shall not include consultant and expert witness fees, and honoraria fees received by Physician to the extent those consultant, expert witness or honoraria fees are earned outside of Physician's scope of employment with Practice.

[DE 1-1, Page ID# 14 (emphasis added)].

13

For call fees, Baptist paid LSS a set fee ($1,000 per day)[3] for having its surgeons available on certain dates.  [DE 60-1, Page ID# 1130].  If a surgeon, such as Dr. Turner, was utilized by Baptist, then LSS would collect revenue for said surgical services.  [DE 60-1, Page ID# 1130].  Dr. Turner, during her time with LSS, was on call 143 days.  [DE 61-10, Page ID# 2305].  The parties agree that the money paid by Baptist to LSS for the surgical services provided by Dr. Turner when she was on call is included in Collected Fees.  [DE 60-1, Page ID# 1130].

Dr. Turner argues that the call fees paid to LSS by Baptist for having a surgeon available should also be included in Collected Fees in addition the income she earned when called upon.  LSS disagrees.  Per LSS, the plain language of the Recruitment Agreement precludes such an interpretation, Dr. Turner waived any such argument, and Dr. Turner's argument fails to appreciate that multiple doctors were often on call.  Although these arguments all appear valid on their face, a deeper dive proves Dr. Turner's arguments are valid.

First, examining the plain text of the Recruitment Agreement, the list of revenue included in Collected Fees is unquestionably broad and expansive.  And, equally without question, the list of excluded revenue for Collected Fees is quite narrow.  And nowhere in the definition is express inclusion or exclusion of call fees.  The construction of a written contract is a matter of law to be decided by the court.

---

[3] The parties debate whether the daily fee was raised at some point to $1,500 per day.  [DE 63, Page ID# 2377].  Considering the Court's ruling below, the Court will preserve this dispute, if any, to further supplementation when finalizing LSS's damages.

*Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky.1992). A "written instrument will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky.2003) (quotation and citation omitted). The plain text of the Recruitment Agreement establishes that not only does Collected Fees include revenue earned directly by Dr. Turner's surgical work, but also indirect and direct "professional revenues received on account of services rendered by Physician, Physician's professional practice, including all patient care revenues, ancillary revenues payable to Physician, the Practice or an assignee thereof." [DE 1-1, Page ID# 14 (emphasis added)]. Whether call fees fall under revenues earned indirectly by services rendered by Dr. Turner or ancillary revenue payable to LSS because of Dr. Turner, the call fees are included by a plain, ordinary reading. But for Dr. Turner's availability to be on call and make herself available to render services, LSS does not earn a daily call fee from Baptist. LSS could have more narrowly drafted the language to limit Collected Fees to include and only include revenue generated from Dr. Turner's direct surgical work on patients. But it did not. In fact, reading call fees out of the Collected Fees definition seems nearly impossible given the all-encompassing language.

Second, LSS argued that Dr. Turner waived any such objections to the exclusion of the call fees from Collected Fees. "At no time prior to this litigation did Dr. Turner notify LSS or Baptist Lexington of her new position that call pay should be included in her Collected Fees." [DE 60, Page ID# 1118]. However, Dr. Turner

emailed LSS in the middle of 2019 complaining about this very thing.  [DE 63-1, Page ID# 2385 ("Doesn't each person who takes call get paid a certain amount of money for each call day?  I don't understand why that is not included in my collected fees.")].  Presumably for this reason, LSS abandoned the waiver argument in its reply.  [DE 66, Page ID# 2450-51].  The Court will do the same.

Third, LSS raises a concern about how to calculate the call fee when multiple doctors were on call during a given day.  "Dr. Turner also does not explain how call pay should be allocated when another surgeon was scheduled to take call on the same day to 'back her up' because she was not comfortable handling cases alone."  [DE 66, Page ID# 2451].  The solution is straightforward.  Considering the Recruitment Agreement is silent on this specific issue, LSS should prorate the call fee for that given time between the number of doctors on call during that same time.  The solution provides equal benefit of the bargain to LSS and Dr. Turner.  Otherwise, if LSS's approach is taken, Dr. Turner is simply barred from income she earned under the definition of Collected Fees simply because multiple doctors were on call.  Such a conclusion is unreasonable and conflicts with the intention of the parties as reflected in the contract.  *Journey Acquisition-II, L.P. v. EQT Production Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014) ("[A]n interpretation of the contract that 'gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'") (quoting *L.K. Comstock & Co., Inc. v. Becon Const. Co.*, 932 F. Supp. 948, 967 (E.D. Ky. 1994) (applying Kentucky law).

16

Having reviewed both parties' positions on Collected Fees and the dispute over call fees, the Court concludes that Collected Fees should include call fees paid by Baptist to LSS for the days Dr. Turner was on call prorated with any other doctor(s) that were on call on the same day.

>    b.   *Incremental Expenses*

The next part of the equation that requires examination is Incremental Expenses. Dr. Turner claims that many of the expenses LSS listed under this category should not have been included, such as mentoring fees, personal insurance, and other business expenses. [DE 63, Page ID# 2375]. LSS responds that the Recruitment Agreement expressly includes these expenses. This time, the plain language of the Recruitment Agreement supports LSS.

To be sure, both contracts between Dr. Turner and LSS discuss expenses. The Employment Agreement defines business expenses as follows:

> **Physician Business Expenses**. The Corporation will reimburse physician during each year of this agreement up to $5,000 for cost of continuing medical education and professional meetings and conventions (including but not limited to the costs of travel, lodging, and meals).
>
> …
>
> **Mentoring.** The Corporation will provide mentoring and consulting services of an experienced surgeon … .

[DE 58-7, Page ID# 870, 878]. Meanwhile, the Recruitment Agreement defines Incremental Expenses as follows:

> "Incremental Expenses" is defined as reasonable and actual additional incremental operating expenses attributable to Physician joining the Practice. Projected Incremental Expenses are stated in Exhibit A, attached hereto and incorporated herein by reference.

17

[DE 1-1, Page ID# 14].  Exhibit A to the Recruitment provides a long list of expenses included in that definition of Incremental Expenses.  Those expenses include things such as mentoring fees, personal insurance, and other business expenses, such as society dues, etc.  [DE 1-1, Page ID# 30].  The list is specific and includes estimates for each year of Dr. Turner's contract.

The tension between the parties is how these two contracts interplay.  From Dr. Turner's perspective, the Employment Agreement makes clear that LSS must compensate her for certain expenses.  Thus, LSS is precluded from including those expenses.  In her view, she should get the benefit of the Employment Agreement's terms.  From LSS's perspective, the Recruitment Agreement places the burden of these same expenses on Dr. Turner irrespective of the Employment Agreement.

In the end, LSS's position clearly prevails.  The legal issue before the Court is how Incremental Expenses is defined and what expenses are included in that definition.  The Recruitment Agreement is specific on that list and includes estimates for each for the duration of Dr. Turner's contract.  Dr. Turner understandably points out that the Employment Agreement, at times, conflicts with the Recruitment Agreement on treatment of expenses.  But the Employment Agreement's notion of business expenses has no legal relevance on the definition of Incremental Expenses in the Recruitment Agreement.  The contracts, as drafted and signed by the parties, could result in a situation where LSS compensates Dr. Turner for a business expense under the Employment Agreement, but she then owes LSS that same expense under the definition of Incremental Expenses as determining the debt obligation back to

18

Baptist.  Does this result seem circular and inefficient?  Yes.  But LSS and Dr. Turner agreed to these terms and there is nothing patently contradictory, ambiguous, unreasonable, or unlawful about this result.

Dr. Turner also argues that the list of expenses in the Recruitment Agreement is ambiguous as opposed to the specific language of the Employment Agreement.  [DE 63, Page ID# 2376 ("Apparently LSS wants to say that the ambiguity of the Recruitment Agreement controls the specific language of the Employment Agreement and talismanic language in the Recruitment Agreement converts LSS' obligations under the Employment Agreement to be Dr. Turner's.")].  The Court finds the reverse to be true.  Per the Employment Agreement, the expenses are defined as "continuing medical education and professional meetings and conventions" as well as "mentoring and consulting services of an experienced surgeon".  [DE 58-7, Page ID# 870, 878].  These terms seem vague when compared against the specific list of expenses included under Incremental Expenses in the Recruitment Agreement:

19

Annual estimated additional incremental operating expenses attributable to Physician joining the Practice are as follows:

| Estimated Incremental Expense | | |
|---|---|---|
| Expense Category | Estimated Annual Expenses Year One | Estimated Annual Expenses Year Two |
| Office Set-up | $6,000.00 | |
| Allscripts Licenses, etc. | $6,450.00 | $6,450.00 |
| Payroll Taxes and withholdings | $19,480.00 | $11,000.00 |
| Malpractice Insurance | $7,100.00 | $7,100.00 |
| Health & Dental Insurance | $12,856.00 | $12,856.00 |
| Life & Disability Insurance | $5,600.00 | $5,600.00 |
| Continuing Medical Education | $5,000.00 | $5,000.00 |
| Miscellaneous Expenses, including medical society dues, cell phone, journal subscriptions | $5,000.00 | $5,000.00 |
| Salary for Clinical Assistant | 0 | $45,600.00 |
| Billing Expenses – 5% of collections (assuming $400,000 @ 5%) | $20,000.00 | $20,000.00 |
| Mentoring Services* | $75,000.00 | 0 |
| Total | $162,486.00 | $118,606.00 |

[DE 1-1, Page ID# 30]. The Recruitment Agreement's description of Incremental Expenses is far from ambiguous as suggested by Dr. Turner.

LSS has properly characterized the Incremental Expenses as that term is defined in the Recruitment Agreement.

> c.   *Runout Period*

After finding the difference between Collected Fees and Incremental Expenses, the Recruitment Agreement includes revenue collected by LSS on behalf of Dr. Turner during the ninety-day Runout Period. LSS has calculated that Dr. Turner generated $23,252.55 during the Runout Period. In support, LSS has provided an affidavit from Hillary Fugate, LSS's Office Manager, attesting to that amount as well as attaching a productivity analysis document from October 2019 through January

20

2020 demonstrating charges, charge changes, payments, refunds and debits, adjustments, and transfers.

In response, Dr. Turner contests the validity of these numbers. "LSS provides no support for this statement nor accounting to verify said amount. Dr. Turner stands by her previous statement that the true balance of the debt she allegedly owes is currently unknown." [DE 63, Page ID# 2375].

However, as mentioned above, LSS did provide both a sworn statement and accounting supporting the number. Dr. Turner provides no proof to counter those numbers beyond the bald assertion that the number is wrong. Stated another way, LSS has argued and provided evidence that no material dispute of act exists as to this figure. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 323). Dr. Turner "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Dr. Turner has not done that.

Considering the evidence as presented by LSS, the Court must take the calculation for the Runout Period as true and accurate.

### d.   *Interest and Attorneys' Fees*

Having addressed the formulation for the money owed by Dr. Turner under the Recruitment and Employment Agreements, the Court next turns to LSS's claim for interest. There are actually two interest calculations included in LSS's damage claims. First, LSS had to pay interest to Baptist when repaying the debt. [DE 60, Page ID# 1109 ("Consistent with the Recruitment Agreement, Baptist Lexington allowed the outstanding balance to be repaid over 24 months, plus interest of 5.75%

(prime rate of 4.75%, plus 1%).   (Peel Dec., ¶ 5.)   In response to the COVID-19 pandemic, that repayment schedule was modified on April 2, 2020.  (*Id*.)"].  Dr. Turner does not challenge the interest calculation paid by LSS as part of its overall payment to Baptist that is now owed by Dr. Turner via the Employment and Recruitment Agreements.  Thus, the Court will again take the unchallenged numbers as accurate.

Second, LSS seeks interest on the judgment itself, although it never specifies whether that is pre-judgment or post-judgment interest.   In fact, according to its Amended Complaint, LSS has never sought the relief of pre-judgment or post-judgment interest.  [DE 37].  Regardless, the "longstanding rule in [Kentucky] is that prejudgment interest is awarded as a matter of right on a liquidated demand[.]"  *3D Enters. Contracting Corp. v. Louisville & Jefferson County Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005).  Accordingly, LSS is entitled to prejudgment interest rate at eight percent on the liquidated amount.  *See Osborn v. Griffin*, 865 F.3d 417, 456 (6th Cir. 2017) (applying and citing Kentucky law).

Finally, the Employment Agreement also provides that Dr. Turner must compensate LSS for its reasonable attorneys' fees.  At the time it filed its original motion for summary judgment, counsel for LSS attested that LSS had incurred $117,197.81 in legal fees.  [DE 60-4, Page ID# 1213-34].  The Court can only assume those fees have increased as the parties then fully briefed cross-motions for summary judgment, motions for reconsideration, and a second round of summary judgment practice.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, **IT IS ORDERED** as follows:

22

1.      LSS's Motion for Summary Judgment [DE 80] is **GRANTED**.   Dr. Turner's remaining fraud claim is **DISMISSED WITH PREJUDICE**.

2.      The Court, on its own motion, **GRANTS** summary judgment to LSS on its claims against Dr. Turner.

3.      Within twenty-eight (28) days from entry of this Memorandum Opinion & Order, LSS must file with the Court new calculations setting forth the Collected Fees, Incremental Expenses, Runout Period, accrued interest rate, prejudgment interest, and attorneys' fees considering the Court's Memorandum Opinion & Order. Dr. Turner shall have twenty-one (21) day from LSS's filing to respond contesting the calculation.

Entered this 5th day of March, 2024.



MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF KENTUCKY